UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WORCESTER, ss. | ) | |
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| | ) | |
| LOLONYON AKOUETE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary Proceeding |
| | ) | Case No. 25-04033-CJP |
| JONATHAN R. GOLDSMITH, individual | ) | |
| and as Chapter 7 Trustee for the Estate of | ) | |
| Westborough SPE LLC, et al. | ) | |
| Defendant(s) | ) | |
| | ) | |

**EMERGENCY MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION
FOR PRELIMINARY INJUNCTION**

**I. INTRODUCTION, EMERGENCY BASIS, AND PROCEDURAL BACKGROUND**

Plaintiff / Movant Lolonyon Akouete ("Movant") respectfully submits this Emergency Motion for
Reconsideration under Fed. R. Civ. P. 59(e) and 60(b)(6), as incorporated by Fed. R. Bankr. P.
9023 and 9024, to correct material misapprehensions underlying the Court's December 5, 2025
Order ("Order"). Movant does not seek reconsideration of the Court's denial of injunctive or
declaratory relief under Rule 65. Those issues remain preserved for adjudication in the pending
cross-motions for summary judgment and for appeal.

Movant seeks only one narrow, time-sensitive modification: authorization of a $5,000 partial
distribution corresponding to a **fully documented, severable prepetition expense**—the Sherin &
Lodgen retainer advanced by Movant in December 2022 and expressly included in Claim No. 4.1.
This request is **categorically distinct** from Movant's prior interim-distribution motions, which
sought early payment on **disputed compensation**. By contrast, the $5,000 at issue here is a **fixed,
non-discretionary expenditure** that Movant personally paid to secure counsel for the Debtor at a
critical moment. It has never been disputed by the Trustee and can be reimbursed without affecting
the adjudication of any remaining issues.

Emergency relief is warranted because denial of this limited amount will cause imminent,
irreparable harm. As detailed in the Supplement and affidavit, Movant faces a December 16, 2025
international travel deadline for a long-planned visit to his mother and a longstanding convention.

A third party prepaid Movant's airfare and will suffer financial strain absent prompt reimbursement, and Movant must still pay essential travel expenses. If he cannot travel due to lack of funds, the opportunity is permanently lost and cannot be remedied later.

The factual basis for the $5,000 request is undisputed. Movant's retainer enabled counsel to prepare the Motion to Vacate filed on January 4, 2023—one day before the Tallage redemption deadline—which preserved the Debtor's interest in 231 Turnpike Road, now under agreement for approximately $5.1 million. The same work materially contributed to the recovery of roughly $1.293 million in California funds. The Sherin & Lodgen retainer is therefore a discrete, severable component of Claim No. 4.1 and not part of the broader disputes surrounding Movant's compensation.

Reconsideration is warranted because the Order appears to have treated this limited, claims-based reimbursement request as a renewed attempt to obtain injunctive relief, evaluating it solely through a Rule 65 lens. The Order did not address the undisputed and severable nature of the expense, and it misapprehended the evidence of immediate, non-recoverable harm by suggesting Movant has litigated "without any constraint," despite demonstrated financial limitations. The Order also assessed broader theories—retaliation, discriminatory exclusion, constructive trust— as though they formed the basis of this request, even though the Supplement expressly limited the relief to the $5,000 Sherin & Lodgen retainer and did not reassert, rely on, or incorporate any of the injunctive or declaratory theories from the earlier motion, which were reserved for separate adjudication.

## II. STANDARD FOR RECONSIDERATION

A motion for reconsideration under Fed. R. Civ. P. 59(e), made applicable by Fed. R. Bankr. P. 9023, is an extraordinary remedy and is granted only in limited circumstances. See Nieves Guzmán v. Wiscovitch Rentas (In re Nieves Guzmán), 567 B.R. 854, 862 (B.A.P. 1st Cir. 2017). Courts have emphasized that such relief should be used sparingly, Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006), and generally only where the movant identifies a manifest error of law or fact, newly discovered evidence, or circumstances demonstrating that reconsideration is necessary to prevent manifest injustice. In re Wedgestone Fin., 142 B.R. 7, 8 (Bankr. D. Mass. 1992).

Rule 59(e) does not permit a party to reargue matters previously presented, but it does allow correction where the Court's determination was based on a misapprehension of the factual record or governing legal principles. See Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 21 (1st Cir. 2012). Thus, the focus of Rule 59(e) is not the re-litigation of issues, but the correction of material errors that affected the outcome.

Similarly, Rule 60(b)(6) authorizes relief from an order for "any other reason that justifies relief," and is reserved for exceptional circumstances in which justice requires revisiting the determination. Its application depends on whether the order was influenced by a material misunderstanding, misapprehension, or procedural irregularity such that relief is warranted to ensure a fair result.

Courts applying Bankruptcy Rule 9023, which incorporates Rule 59(e), employ these same principles and grant reconsideration where the record demonstrates that the court overlooked or misapprehended a point of law or fact material to its decision. The rule therefore serves the limited but important function of allowing correction where necessary to prevent manifest injustice.

## III. GROUNDS FOR RECONSIDERATION

Reconsideration is warranted because the Order appears to rest on certain material misunderstandings of the record that affected the Court's analysis of both likelihood of success on the merits and the existence of irreparable harm. Correction of these points is necessary to ensure an accurate application of the governing standards under Rule 59(e) and Rule 60(b)(6).

**A. Misapprehension of the Narrow, Severable Monetary Relief Requested**

The Order rests, in part, on a misapprehension of the nature and scope of the monetary relief Movant sought. Although the Emergency Motion referenced an "immediate partial payment of $10,000," the Supplement did not merely reduce that amount. Instead, the Supplement carved out a separate and severable component of Claim 4.1—the $5,000 Sherin & Lodgen retainer that Movant personally advanced for the Debtor in December 2022—and requested relief solely as to that discrete, fully documented expense, without altering or merging it with the injunctive or declaratory relief already pending. See Supp. ¶¶ 1–4, 12–20. The Supplement expressly asked the Court to "focus on one discrete, fully documented component of my existing proof of claim: the $5,000 Sherin & Lodgen retainer that I personally advanced," and sought "an immediate partial payment of $5,000… on account of that retainer," to be treated as a partial allowance or interim distribution on the Sherin & Lodgen component of Claim 4.1 and credited against whatever amount is ultimately allowed. Supp. ¶¶ 2–3, 21–22. The Supplement therefore did not "reduce" a request under Rule 65, but instead invoked the claims-allowance framework for a different, severable form of relief.

The Order, however, treats the monetary relief as a generalized request for interim distribution on a disputed claim, indistinguishable from prior requests the Court has denied, and does not address the Supplement's narrowing of the request to a severable, fully documented $5,000 expenditure that directly preserved the Debtor's principal asset. See Supp. ¶¶ 13–20 (detailing the December 14–15, 2022 retainer payment, Attorney Morris's drafting of the Motion to Vacate, and Movant's emergency filing actions on January 4, 2023, which prevented permanent loss of the 231 Turnpike Road property under Tallage). Nor does the Order acknowledge the undisputed evidence that co-contributor Denise Edwards expressly consented to Movant receiving the $5,000 now, subject to a $500 allocation to her, eliminating any intra-creditor dispute as to that component. Supp. ¶ 14.

In addition, the Emergency Motion and Affidavit framed the requested payment as narrowly tailored emergency relief to address a specific, imminent hardship—Movant's inability to fund the required yellow fever vaccination and essential travel expenses for an international trip scheduled for December 16, 2025, a trip planned for several years for the purpose of visiting his biological mother in Togo and attending an international convention as an appointed delegate. Mot. ¶¶ 8, 21–22; Supp. ¶¶ 17–19; Akouete Aff. ¶¶ 35–42. The Order's conclusion that Movant has suffered no irreparable harm, based principally on the number of motions he has filed, does not engage with these circumstances or the record evidence that, without minimal immediate relief, Movant risks losing the ability to undertake this long-planned international trip and, as a consequence, will face serious practical limitations on his ability to continue participating **meaningfully** in this case.

Movant now further narrows his request on reconsideration and seeks only this $5,000 relief, as a one-time partial distribution on the Sherin & Lodgen component of Claim 4.1, credited against whatever amount is ultimately allowed. In light of the Supplement and the supporting affidavit, the characterization of the monetary request as merely another iteration of previously denied interim-distribution motions reflects a material misapprehension of both the record and the limited relief actually sought. Correcting that misapprehension is within the narrow scope of Rule 59(e) and Rule 60(b)(6) and is necessary to prevent manifest injustice.

**B. Clarification of Narrowed Relief and Removal of Rule 65 Considerations**

For purposes of reconsideration, Movant clarifies that the relief now sought is limited to a single, discrete item: an immediate $5,000 payment representing the severable Sherin & Lodgen retainer component of Claim No. 4.1, to be credited against whatever amount is ultimately allowed on the claim. Movant is not asking the Court to revisit or re-adjudicate the portions of the Order addressing injunctive or declaratory relief; those issues remain preserved for the pending summary-judgment process and any subsequent appellate review.

This clarification is material because the Order evaluated the Emergency Motion solely under Fed. R. Civ. P. 65, as incorporated by Fed. R. Bankr. P. 7065. The presently requested relief, however, is not injunctive in nature, does not require application of Rule 65 standards, and does not implicate the security provision of Rule 65(c). The $5,000 request is not coercive, does not restrain the Trustee, and does not alter the administration of the estate; it concerns only a modest, identifiable portion of an already-filed claim based on prepetition expenditures that directly preserved the estate's primary asset.

Reconsideration is therefore appropriate to correct the Court's prior misapprehension of the scope and character of the relief sought and to permit evaluation of this materially narrower, claims-based request on its own terms, rather than through the preliminary-injunction framework applied in the original Order.

**C. The Trustee's Conduct Cannot Be Dismissed as Mere Business Judgment**

The Order characterizes the Trustee's actions as ordinary "business judgment" and concludes that Plaintiff has not shown discriminatory or retaliatory motive. Respectfully, that characterization does not fairly reflect the pattern of conduct alleged against the Trustee.

From the outset of this case, the Trustee's treatment of Plaintiff was not neutral. At the § 341 meeting, the Trustee's only substantive question to Plaintiff was essentially, *"How did you get involved in this?"* He did not ask ordinary questions about the Debtor's books, operations, or history. Instead, he focused on Plaintiff's very presence in the case, implicitly treating Plaintiff as out of place rather than as a legitimate creditor and asset-recovery professional. That initial stance set the tone for everything that followed.

When Plaintiff informed the Trustee that the 231 Turnpike Road property was worth approximately $5 million, the Trustee summarily dismissed that valuation and chose instead to rely on the Town and Ferris Development Group. He did not undertake serious investigation of the Debtor's affairs, did not meaningfully explore Plaintiff's information, and did not test the market until Plaintiff, without estate resources, was forced to list the property on a website to prove that buyers existed at or near the $5 million level. Only then did the Trustee's assumptions about value begin to be challenged.

The same pattern appears in the treatment of Plaintiff's compensation and settlement rights. Plaintiff warned the Trustee on a phone call that LAX Media and Ferris intended to acquire the property for approximately $2.5–$2.8 million and immediately resell it for roughly $5 million, capturing an instant profit of around $2.5 million that would bypass the creditors who made the recovery possible. The Trustee responded, in substance, that he did not care and that there was nothing Plaintiff could do about it. In other words, the Trustee was willing to tolerate a multimillion-dollar windfall for third-party, non-Black bidders, but simultaneously insisted that

Plaintiff's own recovery be capped at roughly $600,000 and threatened that, if Plaintiff refused that "nuisance" amount, the Trustee would ensure that Plaintiff "gets nothing at the end."

That is not neutral business judgment. A fiduciary who is genuinely exercising business judgment to maximize value does not:

- Dismiss a creditor's $5 million valuation out of hand while uncritically accepting a $2.5–$2.8 million structure that allows others to flip the asset for nearly double;
- Announce that he "doesn't care" if favored parties make an instant $2.5 million profit, while simultaneously fighting to limit the Black creditor who found the asset to a nuisance-level recovery; and
- Deploy estate resources to oppose and punish that creditor when he will not accept the nuisance figure.

The Trustee's position toward Plaintiff mirrors the earlier "nuisance fee" stance taken by Peter Blaustein, who initially offered Plaintiff 10% of the $1.2 million and 5% of the $5 million recovery—framing those amounts as a nuisance fee to "get rid of" Movant. The Trustee has effectively adopted the same ceiling on Plaintiff's value—approximately $600,000—while imposing no comparable restraint on the profits that Ferris or LAX Media could extract from the sale of the property. That asymmetry, especially when viewed alongside internal statements expressing a desire that Plaintiff "get nothing," cannot be explained by neutral economic considerations. It is consistent with a retaliatory and discriminatory motive.

Under § 1981 and § 1983, the issue is not whether the Trustee can articulate *some* business reason after the fact, but whether race and retaliation were a but-for cause of the denial of equal contracting opportunities and equal access to the process. Here, the allegations show:

- An initial posture of suspicion toward Plaintiff's involvement rather than investigation of the Debtor's affairs;
- A pattern of discounting Plaintiff's information and work product while embracing the positions of non-Black insiders and bidders;
- A willingness to allow non-Black parties to profit by millions from Plaintiff's efforts, coupled with an express threat that Plaintiff will receive nothing if he will not accept a "nuisance" payout.

Taken together, these facts plausibly allege intentional discrimination and retaliation. To categorize this course of conduct as mere "business judgment" is to strip the civil-rights counts of their factual core and to resolve disputed motive in the Trustee's favor at the threshold. That is a misapprehension of the record that warrants reconsideration, particularly where the Court's denial of even a narrow, severable $5,000 distribution was expressly predicated on the conclusion that Plaintiff had shown no likelihood of success on his civil-rights theories.

**Additional Evidence Undermining the "Business Judgment" Explanation**

Further, on November 26, 2025, Attorney **Lenard B. Zide**, who represents parties aligned with the settlement group in this case, contacted Plaintiff directly. Attorney Zide stated that he was aware of Plaintiff's financial hardship and offered Plaintiff **$150,000—later increasing the offer to $200,000**—to purchase Plaintiff's legal position in the bankruptcy case. The offer required Plaintiff to dismiss his claims and withdraw from further participation. Plaintiff declined.

When Plaintiff later asked whether a smaller advance could be provided simply to alleviate immediate hardship while litigation continued, Attorney Zide refused and reiterated that payment was conditioned solely on Plaintiff's complete exit from the case. Attorney Zide also stated that he was making the offer "on his own initiative," though the proposal mirrored earlier statements by the Trustee that Plaintiff should accept a "nuisance" amount or "get nothing at the end."

This outreach is consistent with the Trustee's documented statements about ensuring Plaintiff "will get nothing" for refusing a below-market settlement. Together with the Trustee's continued delay in adjudicating Plaintiff's claim and the expansion of factual disputes to prolong summary-judgment resolution, the communication supports an inference that Plaintiff was being pressured to abandon his rights, not treated pursuant to neutral business judgment. The direct attempt to buy Plaintiff's legal position—targeted at a financially distressed Black creditor—fits the broader pattern of exclusion and retaliation previously documented in this case.

**Additional Evidence: The IRS Refund Objection Demonstrates Retaliatory Motive**

The pattern is further illustrated by the Trustee's and Petitioning Creditors' opposition to Plaintiff's request for a refund of $430, representing IRS fees advanced prepetition. At the time of the request, Plaintiff's bank account was negative, and he needed the refunded amount to renew his passport, which had expired. The record reflects that Defendants were fully aware of Plaintiff's financial hardship, yet they nonetheless filed vigorous objections to prevent him from receiving even this minimal sum. See Plaintiff's Motion (Dkt. 702, 714); Petitioning Creditors' Objection (Dkt. 734); Trustee's Limited Objection (Dkt. 735).

Notably, the Petitioning Creditors argued that—even though the amount was only $430—the Court should refuse payment to Plaintiff and instead treat the refund as estate property that must remain unavailable until the final distribution under § 726. They went further, suggesting that the refund should be diverted to the court reporter in partial satisfaction of potential transcript costs before Plaintiff may receive any portion of the money he advanced. See Dkt. 734. During the hearing, Petitioning Creditors urged that the refund be deducted from any future distribution Plaintiff might someday receive, ensuring that he would obtain nothing now, despite no legal or equitable basis for depriving him of the return of a de minimis amount advanced on the Debtor's behalf.

This conduct cannot reasonably be characterized as "business judgment." The estate would not have been harmed by the immediate return of $430; the Trustee himself acknowledged the amount was de minimis. The effect—and the apparent purpose—of the opposition was to prevent Plaintiff from obtaining even a small sum he urgently needed to maintain valid identification and continue participating in this case.

The episode aligns with the earlier pattern of telling Plaintiff that, unless he accepted a below-value "nuisance" settlement figure, he would "get nothing at the end." The refusal to permit a financially distressed creditor to receive his own IRS refund, while favored non-Black participants were provided access, concessions, and negotiation channels, reinforces that the Trustee's posture toward Plaintiff was not neutral or fiduciary in nature. Rather, it reflects a retaliatory strategy designed to exhaust Plaintiff financially and force abandonment of his claims.

Taken together with the Trustee's statements and other conduct, this evidence directly contradicts the Order's finding that Plaintiff's allegations amount to "nothing more than the Trustee's exercise of business judgment." It instead shows a targeted and punitive pattern that is directly relevant to the likelihood-of-success analysis on the § 1981 retaliation and discrimination claims.

Trustee's communications with third parties show collusive hostility toward Movant, a pre-determined goal of driving his recovery to zero, and a pattern of marginalization that supports an inference of discriminatory and retaliatory motive—not mere "skepticism." The Court's conclusion that the Trustee's communications with third parties "may show skepticism" but "do not show racial motivation or bias" materially understates the record and ignores the cumulative pattern of hostility, disparagement, and coordination directed uniquely at Movant.

First, in private communications with counsel, the Trustee openly describes Movant not as a creditor whose claim must be evaluated on the merits, but as an adversary to be defeated and driven to zero. On August 13, 2024, the Trustee wrote:
"I have now come to the realization (which I should have come to much earlier) that this guy has no interest in resolving the matter unless he gets a seven-figure settlement – which he will not get!! … As such, I have called in some reinforcements, and we will fight the battle and win the war. There is a good possibility that he will get nothing at the end, but clearly will not get the amount that I offered as a settlement. I already have a legal fee escrow so to speak, in the tune of 1.2 million dollars remitted to me from the State of California." (Email from Trustee Goldsmith to Attorney Zide, Aug. 13, 2024.)
This is not neutral "skepticism." It is a declared litigation objective: that Movant "will not" get a seven-figure recovery and "may get nothing," even though the Trustee simultaneously acknowledges that he already holds $1.2 million in California funds "in escrow" for his own fees, and that Movant's efforts were instrumental in identifying and securing those funds. The language "fight the battle and win the war" shows an intent to break Movant, not to neutrally evaluate a claim.

Second, Attorney Zide's emails amplify that hostility and ridicule Movant personally, with full awareness and participation by the Trustee and other counsel. In one message to the Trustee, Zide states:
"In light of Mr. Akouete's election to go MEDIEVAL on all of us, I checked ChatGPT about your (TEE's) ability to distribute uncontested funds." (Email from Zide to Goldsmith, Aug. 14, 2024.)
In another, Zide refers to the case as the Trustee's "first generative AI Bankruptcy proceeding" and mocks Movant's filings as "Lolo's latest missive." (Emails, May 5, 2024, and Aug. 13–14, 2024.)
Elsewhere, Zide jokes that Movant and Ms. Edwards must have "taken their metal detector to the scenic shores of Lake Cochituate and stumbled upon the long missing Isabella Stuart Gardner Artwork," trivializing the very asset-recovery work that produced the $1.2 million in escheated funds. (Email from Zide, May 5, 2024.)

**The August 21, 2024 email chain between Zide and the Trustee further reinforces this ongoing hostility, ridicule, and collusion.**
On August 21, 2024, writing from Block Island, Zide told the Trustee:
"Steve said we should see some money in about 5 months (4 months after the 17th when Panos *may spank Lolo*). I can do ZOOM…I will mute myself." (Email from Zide to Goldsmith, Aug. 21, 2024.)
Moments later, the Trustee responded:
"Enjoy Block Island. The weather must be beautiful, but perhaps a bit like fall this morning. In terms of the 17th, I don't think you need to be there in person, but feel free to attend via Zoom if you would like." (Email from Goldsmith to Zide, Aug. 21, 2024.)
Earlier that morning, Zide told the Trustee:
"Had a nice chat with Steve Gordon yesterday. He informed me Lolo might have made a consequential error with his email. I felt like I needed to contribute something yesterday. Hope I helped a little." (Email from Zide to Goldsmith, Aug. 21, 2024.)

These exchanges show three things: (1) Zide, Gordon, and the Trustee are actively discussing Movant's filings as a coordinated group; (2) they frame Movant as someone to be mocked ("spank Lolo,"), not as a creditor entitled to equal consideration; and (3) the Trustee welcomes these communications, treating disparagement of Movant as ordinary, collegial case strategy. Nothing in these emails suggests neutrality—they reveal a closed circle of decisionmakers reinforcing each other's hostility toward Movant.

Third, petitioning creditors' counsel explicitly urges a strategy of breaking Movant down rather than fairly addressing his evidence. On December 11, 2024, Stephen Gordon wrote to the Trustee and his counsel:
"I doubt that Lolo is ready for a mediator to do anything more than pressure you to settle an absurd $6 million claim for a ridiculous $2 Million. I think he needs to understand how difficult it is going to be for him once the Judge excludes his 'evidence'… I think he needs to see that what he considers persuasive will fall flat in Court. Only then, in my view, could a mediator be helpful. This is not a usual situation nor a person who could be relied upon to act, frankly, in his own best interest. Jonathan was willing to make him (a guy with highly suspect manager bona fides and no written anything) a fantastic deal. But he couldn't see that." (Email from Gordon to Devine and Goldsmith, Dec. 11, 2024.)
Here again, the objective is not to neutrally evaluate claims but to make sure Movant "sees" how "difficult" things will be for him and to use the Court's evidentiary rulings as a tool to force him into a lower number. Movant is described as "a guy with highly suspect manager bona fides and no written anything," even though the Trustee and petitioning creditors have actively resisted Movant's efforts to obtain foundational governance documents from Goulston & Storrs and from beneficial-ownership records that would corroborate his authority.

Fourth, the record shows coordinated strategizing against Movant by the Trustee and Town counsel in response to his filings. On August 5, 2024, Town counsel wrote to the Trustee:
"Do you have any time today or tomorrow [to] discuss a few things in this case, including Lolo's recent spate of filings?" (Email from Smerage to Goldsmith, Aug. 5, 2024.)
Minutes later, they arranged a call to discuss those filings. This is not improper by itself, but in context—with the Trustee already declaring that Movant "will not" get a seven-figure settlement and "may get nothing"—it shows that Movant's filings are being treated as a problem to be neutralized, not as legitimate efforts by a creditor seeking clarification and documentation.

Fifth, communications about the settlement with the Town and Ferris/Lax show a striking contrast between how the Trustee approaches Movant versus how he approaches white institutional actors. When Movant alerted the Trustee that the property was worth approximately $5 million and that Ferris or Lax would flip it for a large profit, the Trustee dismissed Movant's valuation as not credible and initially advanced the settlement without an appraisal. In private, Gordon advised the Trustee that "if the property is worth $5 Million or more, maybe you should think about fighting with everyone rather than settling," but that if an appraisal came in lower, "best to settle as the additional benefit of settling is clearly worth a million dollars." (Email from Gordon to Goldsmith, Aug. 2, 2024.) Yet the Trustee never engaged in a similar cost-benefit analysis with respect to Movant's claim. Instead, he framed Movant as "this guy" who must not be allowed to obtain a seven-figure recovery, and has consistently chosen to "fight the battle and win the war" against Movant while readily compromising with the Town, Ferris, and Lax.

Sixth, other communications further underscore the dismissive, minimizing treatment reserved uniquely for Movant. Gordon writes that "the Judge does not have the same sense of urgency that Mr. Akouete has (about everything)," treating Movant's urgent concerns as an overreaction. (Email to Devine, Jan. 6, 2025.) He advises the Trustee to "stay the course" so the Court can "immediately

deny" Movant's motion for expedited determination, describing Movant's claim as one he "cannot support by any competent evidence" and accusing Movant of "hoping that a mediator will push the Trustee to a seven-figure claim allowance." (Email, Dec. 11, 2024.) In another email, he tells Movant, in effect, that you may "file 100 Motions" and send "any number of emails," but "that will not change the requirement of legal proof," while ignoring that the Trustee and petitioning creditors are simultaneously withholding or resisting the very corporate records that would provide that proof. (Email from Gordon to Akouete et al., Feb. 6, 2025.)

Taken together, these communications do far more than show "skepticism." They show:
• a pre-announced goal to ensure Movant "will not get" a seven-figure recovery and "may get nothing,"
• coordinated strategizing with Town and petitioning creditors' counsel about how to neutralize Movant's filings,
• mockery and marginalization of Movant's work and identity (e.g., "go MEDIEVAL," "generative AI Bankruptcy," "Isabella Stuart Gardner Artwork," "not a person who could be relied upon to act in his own best interest," "spank Lolo"), and
• a double standard in how the Trustee treats institutional actors (Town, Ferris, Lax, petitioning creditors) versus the only Black creditor who identified and pursued the $1.2 million California asset and challenged the undervalued settlement.

Under civil-rights standards, discriminatory intent may be inferred from "the totality of the relevant facts," including patterns of hostility, selective enforcement, and disparate treatment—not just explicit racial slurs. The Court's prior characterization of these communications as showing only "skepticism" fails to grapple with that total pattern. When the Trustee publicly claims neutral business judgment but privately vows to "fight the battle and win the war" so that Movant "may get nothing," while protecting his own access to a $1.2 million "legal fee escrow" and deferring to white counterparties, it is at least a plausible—and legally cognizable—inference that race and retaliation played a role in how Movant's claim has been treated.

These facts—documented in the Trustee's own words—directly contradict the Order's conclusion that Movant alleged only disagreement with business judgment. The issue is not whether the Trustee was free to negotiate, but whether he acted with discriminatory and retaliatory motive, as proscribed by 42 U.S.C. § 1981. The internal communications constitute direct evidence of animus, coordinated retaliation, and an effort to deprive Movant of equal participation and compensation in the bankruptcy process. At the very least, they are sufficient to demonstrate a likelihood of success far greater than the Order attributed to Movant, warranting reconsideration.

**D. Movant Was Not a Stranger to the Debtor**

The Order states that "it is undisputed that the Movant was a stranger to the Debtor who discovered unclaimed funds through public records." Respectfully, that characterization materially misapprehends the record and the nature of Movant's professional role. Movant did not randomly "stumble upon" the Debtor or its unclaimed property, nor was his involvement the product of chance. Since July 30, 2019, Movant has been registered with the California State Controller's Office as an independent investigator and, after successfully recovering several claims, began focusing specifically on complex, high-value unclaimed-property matters requiring extensive research, ownership analysis, and the tracing of entity histories across multiple jurisdictions.

At the time Movant identified the Debtor's $1,293,646.83 unclaimed fund, he had 32 comparable multimillion-dollar matters active in his CRM, each exceeding $1 million. Examples include: a $3,273,490.34 abandoned savings account belonging to Hongxia Gao (Property ID 1027286773); a

$3,002,230.03 abandoned checking account for Xiaoyu Yan (Property ID 1024273622); a $1,485,645.64 abandoned savings account for the Estate of Norman J. Alexander (Property ID 1029731308); and a $1,325,617.69 abandoned savings account for Esperanza Ovando (Property ID 1030667840). These matters require sustained, specialized investigative work—often months or years—before beneficial ownership can be confirmed and a lawful claim submitted.

Importantly, every one of these listed multimillion-dollar properties remains unclaimed to this day. Nothing has occurred on them in more than three years since Movant suspended work to prioritize the Debtor's investigation. This fact underscores a critical point: absent Movant's focused and sustained effort, nothing would have happened with respect to the Debtor's $1.293 million fund either. The State Controller's website confirms that such claims do not resolve themselves and typically remain dormant unless a qualified investigator expends significant time and resources to unravel the ownership and documentation issues.

The Debtor's unclaimed-property file was not an isolated discovery but one of many high-value matters Movant selected, researched, and pursued using established investigative methods. The specific chronology further demonstrates that Movant's involvement arose from deliberate professional work, not accident. On May 15, 2022, MUFG Union Bank, N.A. reported an abandoned checking account with a balance of $1,293,646.83 in the name of Westborough SPE LLC, with a last contact date of November 21, 2017. On August 28, 2022, Movant and Ms. Denise Edwards began tracing the owner of the account. A search of the listed address (50 California Street, Suite 3610) revealed that it had been used as a Babcock & Brown principal office, which led them to locate Westborough SPE LLC's historical filings and identify its associated individuals, including Dyann Blaine and F. Jan Blaustein Scholes.

On September 9, 2022, Ms. Edwards, located contact information for Dyann and Jan. She left Dyann a voicemail that was never returned, and she successfully reached Jan by phone. Jan explained that she required Peter Blaustein's approval before proceeding.

On September 15, 2022, Ms. Edwards prepared the Standard Investigator Agreement and the Claim for Abandoned Property, obtained Peter's approval through text messages, coordinated with the notary, and arranged for Jan's notarized execution of the documents. After the claim was submitted on September 26, 2022, Ms. Edwards and Movant learned that Dyann's signature was also required because Dyann had withdrawn the entity; however, Dyann refused to respond to repeated attempts to contact her.

This impasse prompted a shift in strategy. On November 20, 2022, Movant and Jan discussed options for restoring title to the locus property. They concluded that obtaining a Bill of Sale, reviving the entity, paying back taxes, and reinstating the company would be the most efficient path—particularly since Dyann refused to participate and therefore could not be relied upon for the CUPD claim.

On November 29, 2022, Movant obtained RFP documents from BidNetDirect.com to confirm the tax obligations and redemption timeline. Contrary to the Town's briefing, Movant did not discover the real estate through the RFP process; he discovered it only through the unclaimed bank account investigation. The RFP documents were pursued later to calculate the amounts necessary to restore the Debtor's title.

This sequence of events demonstrates that once Movant began investigating the Debtor's file, his work naturally uncovered the Debtor's ownership structure, historical management, and connection to the Massachusetts commercial property. These discoveries were a direct outgrowth of his

professional investigative process—not a coincidence, and not the result of unfamiliarity with the Debtor. As the investigation grew more complex, Movant suspended work on all 32 other multimillion-dollar matters to focus exclusively on resolving the Debtor's file, tracing beneficial ownership, and securing the unclaimed funds.

Thus, Movant's involvement is not that of an outsider who happened upon the Debtor by accident. It is the result of deliberate professional engagement, rooted in years of experience and an established investigative relationship with the California State Controller's Office. Characterizing Movant as a "stranger to the Debtor" overlooks this background and minimizes the work that led to the recovery of the $1.293 million asset—work that no party associated with the Debtor, including the Trustee, had undertaken or even discovered. Movant's involvement was neither incidental nor uninformed; it was the product of systematic investigative effort that directly preserved a major estate asset and triggered the chain of events leading to this bankruptcy proceeding.

**E. Clarification Regarding the Nature of Movant's Actions and the Authority of the Signatory**

The Order describes Movant as having "aggressively" pursued a claim based on documents signed by "a former officer" of "a former corporate manager" who "apparently was the subject of a guardianship order." Respectfully, several assumptions embedded in this characterization are not supported by the record.

First, Movant's interactions with F. Jan Blaustein Scholes did not arise from improper conduct or solicitation of an incapacitated individual. Movant engaged with Ms. Scholes only because her son, Peter Blaustein—who is the same individual the Trustee now refers to as her "guardian"—directed Movant to work with her to recover the unclaimed funds. At that time, Peter raised no issue of incapacity, guardianship restrictions, or lack of authority. To the contrary, he facilitated communications and treated his mother as the appropriate person to execute documents related to the recovery. The Hawaii guardianship was never mentioned until much later, after disputes arose over compensation and control of the recovery process. This sequence substantially undercuts the inference that Movant acted improperly or sought the involvement of someone lacking capacity.

The factual chronology further confirms that Movant did not target or seek out a vulnerable individual. Movant and Ms. Edwards first identified the abandoned checking account reported on May 15, 2022, by MUFG Union Bank, N.A., and began tracing the owner. Ms. Edwards contacted Ms. Scholes only after identifying her as the officer historically associated with Westborough SPE LLC and only after Peter expressly instructed that she was the correct person to execute the documents. Ms. Edwards coordinated with Peter for approval of the recovery forms, with the notary, and with Jan for execution, all with Peter's knowledge and cooperation. When Dyann refused to respond to required signature requests and the recovery plan had to be revised, Movant and Ms. Edwards again followed Peter's original instruction by sending the revised documents directly to the notary for Jan's execution. Because Peter expressly authorized them to work directly with his mother and never raised any issue of incapacity or limitation, there was no basis for Movant or Ms. Edwards to believe that such coordination was improper or unauthorized.

Second, the description of Ms. Scholes as a "former officer" is not supported by competent evidence. The governing documents of Babcock & Brown Administrative Services, Inc. and Babcock & Brown Administrative Services, LLC identify her as President and Vice President, and the Trustee has produced no resignation, removal, board action, amendment, or corporate documentation terminating her officer status. Likewise, the characterization of Babcock & Brown as a "former corporate manager" assumes facts not established in the record. The Operating

Agreement requires member consent for resignation or replacement of the Manager. No such authorization has been identified. The validity of the purported resignation and merger remains disputed and has not been established under either the Operating Agreement or Delaware law. Thus, the Court's description appears to presuppose factual conclusions that have not yet been substantiated.

Third, the reference to a Hawaii guardianship order warrants clarification. While such an order exists, its legal effect is limited. Guardianship and conservatorship orders are not final judgments and therefore are not automatically entitled to full faith and credit. Their enforceability also depends on the issuing court's continuing jurisdiction. Under Haw. Rev. Stat. § 560:5-106(1), Hawaii courts have jurisdiction over guardianship and conservatorship proceedings only when the protected person is domiciled in Hawaii, present in Hawaii, or has property located in Hawaii. Ms. Scholes relocated to Arizona in December 2019, and there is no evidence that she maintained domicile, retained property, or otherwise remained subject to Hawaii's supervisory authority after leaving the state.

Additionally, Rule 107(c) requires conservators to maintain Hawaii-based, interest-bearing conservatorship accounts, periodic accountings, and other judicially supervised obligations. There is no evidence that any required accounts were established or that statutory reporting obligations were ever satisfied. These omissions call into question whether the conservatorship remained active or compliant.

Most importantly, the Hawaii order was never registered in Massachusetts or Arizona under the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (UAGPPJA). Without registration, the order has no legal effect outside Hawaii and cannot be used to restrict Ms. Scholes's authority or to establish incapacity at the relevant time. No medical evidence, contemporaneous evaluation, or judicial finding has been offered to show that she lacked contractual or corporate capacity when she signed the recovery documents.

Movant's conduct, therefore, was not "aggressive" in the sense suggested. Movant undertook ordinary due diligence in a complex setting marked by layered entities, inconsistent records, and the absence of basic corporate documentation. Movant relied on the documents available to him—documents showing Ms. Scholes as an officer of the Manager—and acted only after being directed by her son to work with her. The later invocation of an unregistered, dormant conservatorship appears connected to a change in Peter's objectives, not to Movant's conduct.

In sum, the assumptions that the signatory was a "former officer," that the Manager was "former," or that a valid guardianship legally precluded her actions are not supported by the present evidentiary record. Clarifying these issues is essential because they bear directly on the Court's assessment of Movant's likelihood of success regarding corporate authority, contractual validity, and the accuracy of the Trustee's factual premises.

### G. Clarification Regarding the Evolution of Movant's Compensation Claim

The Order states that Movant "contends he is entitled to more than $3 million in compensation." Respectfully, this framing omits essential context. Movant did not begin with a multimillion-dollar claim; the present amount is the byproduct of the Trustee's refusal over nearly two years to recognize or pay Movant's original, far smaller compensation request, combined with the resulting delays, increased work, and litigation costs.

Movant's proofs of claim demonstrate this clearly. The first claim—approximately $625,000—represented Movant's original compensation for locating and recovering the Debtor's $1.293 million unclaimed property and for the substantial work required to reconstruct the Debtor's corporate and ownership history. Only after the Trustee declined to pay any portion of this reasonable amount and instead chose to litigate for more than eighteen months did the claim increase. Each amendment reflected the expanding scope of work and damages caused by the Trustee's litigation posture—not an inflated starting position by Movant. Indeed, the Trustee's current willingness to discuss a settlement amount similar to Movant's original $600,000 request confirms that the initial figure was reasonable and that the later escalation resulted from the Trustee's conduct, not from Movant's demands.

Although the Trustee now administers the estate and holds statutory authority under the Bankruptcy Code, that does not change the origin of Movant's compensation rights. The Westborough SPE LLC Operating Agreement expressly provides that the Manager "shall have full and complete authority…to retain agents and to determine the compensation payable to such agents," and that the Company must indemnify and reimburse the Manager for expenses incurred in performing its duties. This authority is reinforced by the Administrative Services Agreement, which states that Westborough must pay the Manager "such amount as [the Manager] determines, in its sole discretion, is reasonable" for the services provided. These governing documents show that the compensation Movant seeks is rooted in prepetition contractual rights belonging to the Manager—not in any postpetition demand to override the Trustee's administration of the estate.

Movant's original compensation methodology is also consistent with standard industry practice. For complex, multijurisdictional asset-recovery matters—particularly those involving legal, historical, and corporate investigations across multiple states and countries—contingency fees of 50% are customary. Here, Movant spent three years unraveling a 25-year-old structured finance transaction, tracing corporate mergers and cancellations across Delaware, California, and the British Virgin Islands, locating the Debtor's abandoned property interest, and preserving an asset that no party associated with the Debtor had discovered. A fee reflecting this scope of work is neither extraordinary nor excessive; it is ordinary for the industry and squarely within the Manager's contractual discretion.

Thus, the suggestion that Movant simply "asserted a more than $3 million claim" obscures the causal chain that produced that amount. Movant began with a reasonable, contractually supported claim of approximately $625,000. The Trustee's refusal to evaluate or pay that claim, combined with prolonged litigation and additional work made necessary by the Trustee's inaction, is what increased the figure over time. The Trustee's present willingness to settle near Movant's original number underscores that the original amount—not the later escalated amount—best reflects the reasonable value of Movant's work.

For these reasons, the characterization of Movant's compensation claim as a fixed "$3 million" demand is incomplete and materially misleading. When viewed in proper context, the record shows that Movant acted consistently with the governing agreements, industry standards, and the Manager's lawful authority, and that the escalation of the claim was driven by the Trustee's strategic decisions rather than by Movant's expectations.

**H. Clarification of the Nature of the Trustee's Objection and the Benefits Conferred by Movant**

The Order notes that the Trustee has objected to Movant's claim, that cross-motions for summary judgment are under advisement, and that "on initial review" the objection appears non-frivolous,

supported, consistent with the Trustee's duties, and not suggestive of improper bias. Respectfully, this description does not fully reflect the character of the objection or the context in which it arises. The Trustee is not merely disputing the amount of Movant's compensation; he seeks **complete disallowance**, as though the estate owes nothing whatsoever for work that produced demonstrable, quantifiable benefits. Once the actual posture is examined, the Trustee's objection cannot be treated as a routine or neutral challenge to a disputed amount.

The undisputed factual record shows that Movant performed a series of actions that directly created or preserved substantial estate value. Movant located and pursued recovery of the $1.293 million asset held by the California State Controller, provided the information the Trustee used to secure release of those funds, revived the Debtor's corporate status so the Debtor could assert rights, paid essential administrative fees, reconstructed the managerial and ownership records the Trustee now relies upon, and—most critically—funded counsel and personally filed the Motion to Vacate the tax-foreclosure judgment on January 4, 2023, one day before the statutory deadline. If Movant had not taken those steps, the Debtor's real-property interest at 231 Turnpike Road would have been permanently extinguished, and the estate would now possess neither the $1.293 million in recovered funds nor the ability to market a real-property claim valued at approximately $5.1 million.

Yet the Trustee's objection takes the position that Movant should receive **nothing at all**. In practical terms, the Trustee asks the Court to hold that reviving the Debtor's legal existence, preserving the Debtor's property rights, securing recovery of the California funds, advancing out-of-pocket legal and administrative costs, and providing the Trustee with the critical information necessary to obtain the $1.293 million are all contributions worth **zero**. That position is difficult to reconcile with basic principles of claim allowance, quantum meruit, unjust enrichment, and the fiduciary obligation to recognize value conferred upon the estate.

The summary-judgment record underscores this contradiction. The Trustee expressly admits that Movant provided him with the information enabling the Trustee to file the submission that resulted in release of the $1.293 million. That admission eliminates any serious dispute that Movant's efforts directly benefitted the estate. If the Trustee acknowledges that Movant supplied the key information that led to a seven-figure recovery for creditors, the remaining question is not whether Movant is entitled to **anything**, but how much compensation is reasonable. The Trustee's objection, structured as total disallowance, sidesteps that inquiry by attempting to convert an ordinary valuation dispute into a collateral battle over historic management issues, mergers, and guardianship matters—none of which alter the fact that Movant conferred direct economic benefit.

This context matters when considering likelihood of success and irreparable harm. The Order's initial description understandably focused on the Trustee's general authority to object, but it did not address the extremity of a request for **complete disallowance** despite the Trustee's own admission of benefit. Nor did the initial characterization reflect the reality that Movant now seeks only a narrow and severable $5,000 interim payment—representing reimbursement of the Sherin & Lodgen retainer that funded the drafting of the Motion to Vacate—rather than the full compensatory amount.

The central point is that the Trustee's objection is not a garden-variety dispute over valuation. It is an attempt to deny compensation altogether despite undisputed, substantial benefits conferred. In these circumstances, Movant has a strong likelihood of obtaining at least partial allowance of his claim, and the extremity of the Trustee's position only heightens the irreparable harm from continued nonpayment. Reconsideration is warranted because the Order's preliminary characterization does not fully capture the objection's actual posture, its departure from standard

claim-evaluation principles, or the implications of the Trustee's own admissions in the summary-judgment record.

The Trustee has also stated that he will not engage in meaningful settlement discussions because he has "already spent money" preparing summary judgment and wants to "see the outcome first" before considering resolution. This justification has nothing to do with the merits of Movant's claim or the value Movant conferred on the estate. Instead, it reflects a strategy-driven decision to continue litigating simply because resources have already been expended—an approach irreconcilable with the Trustee's fiduciary obligation to maximize value and minimize unnecessary administrative costs. Settlement decisions must be based on fairness, reasonableness, and the interests of creditors, not on the desire to vindicate prior litigation expenditures or to "win the war," as the Trustee previously stated. When combined with the Trustee's counsel's earlier admission that Movant "should have taken the $600,000" and "now [he is] not going to get anything," the refusal to negotiate until after summary judgment only underscores that the objection is being prosecuted as a matter of litigation posture and retaliation, not principled estate administration.

## J. Contractual Allocation of the California Funds and Constructive Trust

Respectfully, the Court's conclusion that Movant "has no likelihood of success" on his California funds claim rests on a misapprehension of both (1) Movant's legal theory and (2) the governing contracts. Movant has never argued that the Debtor lacks legal title to the $1.293 million. Rather, Movant's position is that the Debtor holds legal title subject to binding, prepetition contractual obligations that require those funds to be used to pay managerial compensation and reimbursable expenses—including Movant's compensation as successor Manager.

The Trustee has now held those funds for nearly two years while refusing to pay even the minimum management compensation and reimbursements that the Debtor promised by contract. That is precisely the situation in which a constructive trust is appropriate: where the estate holds legal title to property but equity requires that a specific portion be applied to a particular claimant to prevent unjust enrichment.

## 1. The LLC Agreement mandates reimbursement and indemnification of the Manager

The October 22, 1997 Westborough SPE LLC Limited Liability Company Agreement vests management and control in the Manager and mandates reimbursement and indemnification:

- Section 1(e) provides that *"the overall management and control of the business and affairs of the Company… shall be vested in the Manager, who shall have the sole power and authority to make any decision and to take any action and to exercise any power on behalf of the Company which the Company has the right, power and authority to take."*
- Section 1(h) provides that *"[t]he Manager shall be entitled to reimbursement from the Company for all expenses incurred by such Manager in managing and conducting the business and affairs of the Company."*
- Section 1(j) further provides that the Company shall indemnify, defend, and hold harmless the Manager and related indemnitees from "any liability, loss, or damage… including reasonable attorneys' fees and costs," so long as the Manager acted in good faith and without fraud, gross negligence, or willful misconduct.

These provisions do three critical things:

1. They recognize that the Manager is the one who runs and preserves the Company's business and assets.
2. They impose a mandatory duty on the Company to reimburse the Manager for expenses incurred in managing and conducting the Company's business.
3. They require the Company to indemnify and protect the Manager from losses and liabilities tied to that work, including attorneys' fees and related costs.

Movant's work in discovering, documenting, and facilitating recovery of the $1.293 million, reviving the Debtor, and preserving its real-estate interest is exactly the kind of "managing and conducting the business and affairs of the Company" that §1(h) and §1(j) address. As successor Manager, Movant stands in the Manager's shoes for purposes of reimbursement and indemnification under these provisions.

**2. The Administrative Services Agreement gives the Manager sole discretion to set compensation and guarantees reimbursement of expenses**

The Administrative Services Agreement, dated October 30, 1997, between Westborough SPE LLC and Babcock & Brown Administrative Services, Inc. ("BBAS"), reinforces this structure.

Section 2 ("Compensation for Services") provides that Westborough:

- "shall pay BBAS an annual administrative services fee equal to the greater of (a) $5,000 per annum, or (b) such other amount as BBAS determines, in its sole discretion, is reasonable to compensate it for the Services that it has provided during the year."

It also requires that:

- "Westborough shall reimburse BBAS for all direct, reasonable out-of-pocket expenses that BBAS incurs in performing the Services…"

And Section 4 authorizes BBAS to engage third parties—lawyers, accountants, consultants—"at Westborough's expense."

Taken together, the LLC Agreement and Administrative Services Agreement establish that:

- The Manager has sole discretion to determine reasonable compensation for services;
- Westborough must pay the Manager that compensation;
- Westborough must reimburse all reasonable, direct out-of-pocket expenses; and
- Third-party professionals engaged by the Manager are expressly to be paid at Westborough's expense.

Movant was appointed by the Manager's highest remaining officer and acted as successor Manager in performing the services that produced the California recovery and preserved the Debtor's real-estate interest. His compensation and reimbursements therefore flow directly from these Manager-centric contractual rights.

**3. These contractual duties support a constructive trust when the Trustee refuses to honor them**

Under Massachusetts law, a constructive trust is imposed when one party holds title to property but, in equity and good conscience, cannot retain the beneficial interest because it would result in unjust enrichment. Here:

- The estate holds legal title to the $1.293 million.
- The governing contracts require that those funds be used, in part, to pay the Manager's fees and reimbursable expenses for managing and conducting the Company's business—which is exactly what Movant did.
- The Trustee has refused for nearly three years to pay any portion of that compensation or reimbursement, while fully retaining the benefit of Movant's work.

That is classic unjust enrichment: the estate keeps 100% of the benefit of Movant's services while paying 0% of the contractually-mandated compensation and expenses.

A constructive trust does not depend on a separate "trust document." It arises by operation of equity where, as here, there are clear contractual obligations, performance by the claimant, retention of the property by the estate, and a refusal to pay what is owed.

**4. The Court's "defies logic" comment rests on a misframing of Movant's argument**

The Court reasoned that Movant's position "defies logic" because it would reduce the funds available to other creditors. Respectfully, that misstates what Movant is arguing. Movant is not saying the Debtor has "no interest" in the funds or that they belong to unknown third parties. He is saying:

- The Debtor's interest in those funds is burdened by prepetition contractual duties to pay the Manager compensation and reimburse expenses;
- The Trustee cannot wipe out those duties simply by calling the funds a "litigation reserve"; and
- Paying a valid contract claim (or recognizing a constructive trust corresponding to that claim) is not illogical—it is how bankruptcy law routinely treats prepetition entitlements.

Every allowed claim reduces the pool available to other creditors. That is not a reason to deny the claim; it is the predictable consequence of honoring legal and equitable rights. Here, the combination of the LLC Agreement (§1(e), §1(h), §1(j)), the Administrative Services Agreement (§2 and §4), and the undisputed fact that Movant's efforts created the California recovery establishes at least a substantial likelihood that Movant is entitled to compensation and reimbursement from those funds, enforceable through constructive-trust principles if the Trustee continues to refuse payment.

**5. Three years of service with no prepaid management fee underscores the equitable harm**

Finally, the Administrative Services Agreement contemplates an annual administrative services fee, payable in advance, plus reimbursement of expenses. Movant has now served in a managerial, recovery, and asset-preservation role for nearly three years, has produced a $1.293 million cash asset and preserved a multi-million-dollar real-estate claim, and yet has not received a single dollar of the prepaid management fee or expense reimbursement that the Debtor's contracts require.

Nothing in the Bankruptcy Code authorizes the Trustee to retain all of the value Movant created while indefinitely withholding the compensation and reimbursements mandated by the LLC Agreement and Administrative Services Agreement. On this record, Movant's constructive-trust

and contractual theories are not speculative; they are grounded in the very documents that govern the Debtor's existence and operations and strongly support a likelihood of success on the merits as to at least a portion of the California funds.

## K. The Court's Irreparable-Harm Finding Misunderstands the Nature of the Harm Identified

The Order concludes that Movant faces no irreparable harm because he has filed "a very large number of motions" and has participated "without any constraint" as to non-duplicative filings. Respectfully, this conclusion does not reflect the actual harms identified in the Emergency Motion, supporting affidavit, and Supplement, and it rests on a misunderstanding of what Movant asserted.

Movant never argued that he is unable to *submit filings*. As clarified in the Supplement, the irreparable harm arises from **time-sensitive, non-repeatable personal and financial circumstances**, not from any inability to draft motions. The ability to transmit documents to the Clerk for docketing does not eliminate the harms already detailed in the record.

First, Movant's participation is not "without constraint." As stated in the Supplement, Movant has no car, no funds for transportation, and a negative bank balance. He has attended every hearing by Zoom because he cannot afford in-person travel. He cannot pay for traditional service of process in the adversary proceeding, obtain necessary transcripts, or bear other routine litigation costs. His filings reflect the burden placed on a pro se litigant who lacks counsel, not an absence of limitation.

Second, the irreparable harm asserted is not about CM/ECF access or docket activity. It is the **imminent and irreversible loss** associated with Movant's December 16 international trip—planned since 2019—and the inability to meet minimal expenses already detailed in the Supplement, including reimbursement of a plane ticket purchased on Movant's behalf and contractual group-lodging obligations. If these expenses cannot be met now, the opportunity is permanently lost and cannot be remedied later.

Thus, the number of motions filed is not evidence that no irreparable harm exists. It does not contradict the Supplement's showing of immediate, non-compensable loss. The Court's finding rests on an assumption—that filing activity reflects unrestricted participation—that is inconsistent with the record already before the Court.

For these reasons, the conclusion that Movant faces "no potential for irreparable harm" is not supported by the circumstances documented in the Emergency Motion and the Supplement, and the misunderstanding should be corrected.

## L. The Court's Balance-of-Harms Analysis Misconstrues the Nature of the Requested Relief

The Order expresses concern that granting relief "could impair estate administration" by placing unwarranted restrictions on the Trustee or compelling premature settlement discussions. Respectfully, the narrow $5,000 relief identified in the Supplement does not restrict the Trustee's administration of the estate, does not interfere with summary-judgment briefing, and does not require the Trustee to negotiate or settle anything.

As clarified in the Supplement, the request is *not* for an injunction dictating how the Trustee must litigate or manage the estate. It is for a **discrete, severable partial payment** representing a fully documented prepetition expense already embedded in Claim 4.1. This limited relief:

- does **not** alter the Trustee's litigation posture,
- does **not** require the Trustee to take or refrain from taking any action regarding the property or adversary proceeding,
- does **not** affect the ongoing summary-judgment process, and
- does **not** compel or even suggest that the Trustee negotiate a settlement.

It is a simple request that the Court recognize an already-filed component of Claim 4.1 and allow a temporary disbursement credited against whatever amount is ultimately allowed. Nothing in this relief constrains the Trustee's discretion or burdens estate administration.

Indeed, the Trustee himself has repeatedly argued (including in correspondence cited in the Supplement) that *any relief to Movant must come through the claims-allowance process.* This $5,000 request **accepts that framework**, and merely asks the Court to resolve one undisputed component now. Granting this relief therefore advances—rather than impairs—the orderly administration of claims.

## M. The Court's Public-Interest Finding Does Not Account for the Narrow, Claims-Process-Based Nature of the Requested Relief

The Order concludes that the public interest would not be served by granting the requested injunction. That conclusion appears premised on the assumption that Movant seeks broad restraints, mandatory settlement, or alteration of the Trustee's statutory duties. But the Supplement expressly narrowed the relief to a **minimal interim allowance** tied to a documented, prepetition payment that preserved the estate's largest asset.

Public interest considerations include:

1. **Honoring documented prepetition expenditures that directly preserved estate assets**, consistent with §§ 105, 502, and 726.
2. **Ensuring that creditors who create actual value for the estate are not left uncompensated while the estate uses the fruits of their work.**
3. **Avoiding procedural gamesmanship**, where a Trustee uses the existence of pending summary-judgment motions to refuse even to acknowledge the undisputed portion of a claim.
4. **Protecting the ability of a pro se creditor to continue participating in a case where he personally located the estate's $1.293 million asset and preserved its multi-million-dollar real-property claim.**

Granting a narrow $5,000 allowance—credited against whatever final amount is allowed—does not impede administration of the estate, does not prejudice other creditors, and does not interfere with the Trustee's statutory responsibilities. It simply recognizes an item already included in Claim 4.1 and already supported by contemporaneous documents that have been in the record since the claim was filed.

The public interest is served, not harmed, by ensuring that estate-preserving expenditures are reimbursed promptly when doing so poses no risk to the estate and prevents irreparable harm to the creditor who incurred them.

## N. The Court Misapprehended the Scope of the Declaratory Relief Requested

The Order states that Movant "seeks a declaratory judgment determining issues already subject to the Trustee's claim objection and pending summary judgment motions," and that such declaratory relief would constitute impermissible "final relief" at the preliminary stage. Respectfully, the Emergency Motion and Supplement show otherwise.

First, the Emergency Motion expressly framed the declaratory request as a *narrow* finding that Movant conferred a compensable benefit, with the *amount* of that compensation to be determined later through the normal process. Paragraph 2 of the motion states that Movant seeks:

"A declaratory judgment that Movant has conferred a substantial and compensable benefit on the Debtor and its stakeholders by preserving the 231 Turnpike Road property and initiating recovery of approximately $1.293 million in California unclaimed funds;"

and paragraph 4 makes clear that:

"Movant therefore seeks a narrow declaratory judgment that he has conferred a substantial, compensable benefit on the Debtor and its stakeholders, and that he is entitled to compensation for that contribution. **Based on that declaration—and in light of Movant's immediate, documented hardship—he asks the Court to order a $10,000 partial payment now, to be credited against whatever amount the Court later allows on his claim.**"

(Emergency Mot. ¶¶ 2, 4 (emphasis added)).

Thus, the declaratory relief requested did **not** ask the Court to finally resolve the Trustee's claim objection, fix the ultimate dollar amount of Movant's claim, or decide the pending cross-motions for summary judgment. It asked for a threshold determination—that Movant has an enforceable entitlement to compensation because he conferred a substantial benefit—while expressly reserving the *amount* and remaining issues for the "ordinary claims-allowance / adversary process" (Emergency Mot. ¶ 17; see also ¶ 3).

Second, the Supplement further narrowed, rather than expanded, the scope of the immediate relief. It specifically asked the Court to focus on one discrete, fully documented component of Claim 4.1—the $5,000 Sherin & Lodgen retainer—and to clarify that:

"this payment is either (a) a partial allowance/interim distribution on the undisputed portion of my timely filed Claim No. 4.1, or (b) such other form of limited relief as the Court deems appropriate, **without prejudice to any party's position on the remaining portions of my claim.**"

(Supp. ¶ 3 (emphasis added); see also ¶¶ 1–4, 21–23).

The Supplement expressly confirms that:

"This Supplement does not add new causes of action. It clarifies and narrows the monetary relief requested in the Emergency Motion." (Supp. ¶ 1); and
"All other injunctive and declaratory relief requested in the Emergency Motion remains the same… This Supplement is intended to sharpen the Court's focus on the narrow, emergency component— reimbursement of the $5,000 retainer—that is already fully embedded in the record." (Supp. ¶ 4).

Third, to the extent the Emergency Motion references declaratory relief concerning the California funds (Count One), Movant did not ask the Court to finally adjudicate ownership of the entire $1.293 million at the preliminary-injunction stage. The requested relief was framed together with

segregation and non-dissipation of contested funds "pending final adjudication" under § 541(d) and Cal. CCP § 1540(d) (Emergency Mot. ¶¶ 11–14, 23, 30; Prayer §§ 1(c), 2(c)). That is protective, interim relief, not a request that the Court enter a final, merits judgment on Count One while cross-motions for summary judgment are still under advisement.

In short, the record shows that Movant (i) grounded his requests in claims already pleaded in the Complaint, (ii) sought a limited declaration that he has an enforceable right to compensation because he conferred a substantial benefit, and (iii) asked for a narrow, interim payment on a small, severable portion of Claim 4.1, expressly "without prejudice" to the final determination of the amount and other disputed issues. The declaratory relief requested was therefore not "final relief" displacing the claim-objection or summary-judgment process, and the Court's characterization in the declaratory judgment rests on a misreading of the Emergency Motion and Supplement.

### O. The Court's Findings on Partial Payment Misapprehend the Nature of the Request

**"Movant's request for immediate partial payment cannot be granted."**
The Court's conclusion rests on the assumption that Movant is seeking *extraordinary equitable relief outside the claims-allowance process*. That is incorrect. The Supplement makes clear that the $5,000 is not a new claim and not an equitable request. It is a discrete, severable, prepetition expenditure already itemized and documented within Claim 4.1, supported by the Sherin & Lodgen engagement letter, payment records, and affidavits.
Because this request arises within the existing proof of claim—and because the $5,000 component is undisputed in its factual existence and purpose—the Court's categorical statement that such relief "cannot be granted" misapprehends the procedural vehicle now being used.

**"Movant's financial hardship has persisted for years."**
The Court treats the longevity of hardship as a reason to deny relief. The factual record shows the opposite: the hardship is now acute, time-sensitive, and tied to **fixed, imminent deadlines** (travel on December 16; reimbursements owed to third parties; inability to purchase required vaccinations). Prior years' hardship does not eliminate irreparable harm now, and the Court's focus on duration overlooks the time-critical nature of the current harm.

**"Court has previously denied similar requests for interim distribution on a disputed claim."**
This finding is correct historically, but it does not apply to the present narrowed request. Earlier requests were denied as *premature*, before the claims process matured and before the Sherin & Lodgen retainer was isolated as a discrete, fully documented component appropriate for partial allowance.
The current request is not for an interim distribution on a broad, disputed claim; it is for a small, fully traceable portion of the claim whose benefit to the estate is not disputed (preservation of the $5.1M asset). The Supplement explicitly aligns the request with the claims-allowance process the Court instructed Movant to use.

**"Court will not grant extraordinary relief simply because Movant repackaged the request."**
The $5,000 request is not a "repackaging." The Supplement **substantively narrows** the relief by:

1.  limiting the request to a *single* documented retainer payment,
2.  tying it strictly to Claim 4.1 (not to equitable theories),
3.  showing written consent from the only co-contributor (Ms. Edwards), and
4.  asking the Court to treat the payment as a **credit** against whatever is ultimately allowed.
    Nothing about this is cosmetic or duplicative; the relief is procedurally different, legally

narrower, and expressly grounded in the very mechanism—claims adjudication—that the Court previously said must govern.

The Court's findings in Partial Payment Misapprehend the Nature of the Request rest on the incorrect assumption that Movant is reasserting prior equitable requests, when in fact the Supplement isolates a single, indisputably documented component of Claim 4.1 suitable for limited partial allowance—something neither requested nor addressed in any prior motion.

## P. Summary of Material Misapprehensions and Need for Reconsideration

Taken together, the foregoing points show that the Order rests on several material misapprehensions of both the record and the relief actually requested:

1. **Scope of Relief Misstated.** The Court treated Movant's request as a broad, equitable bid for interim distribution on a disputed claim and "final" declaratory relief, when the Emergency Motion and, especially, the Supplement narrowed the request to a single, discrete $5,000 Sherin & Lodgen retainer component of Claim 4.1—fully documented, severable, and to be credited against whatever amount is ultimately allowed, without disturbing the pending cross-motions for summary judgment.

2. **Misframing as Rule 65 / Injunctive Relief.** The Order analyzed the motion primarily as a request for preliminary injunctive and declaratory relief under Rule 65. On reconsideration, Movant has withdrawn all injunctive and declaratory components and seeks only a limited, claims-process-based $5,000 distribution. Rule 65 and its security requirement are no longer implicated; what remains is a narrow request for partial allowance or interim distribution on an already-filed claim.

3. **Trustee's Conduct Mischaracterized as "Business Judgment."** The Order characterized the Trustee's conduct as ordinary business judgment, overlooking detailed evidence of a sustained pattern of hostility, threats that Movant "will get nothing at the end," refusal to negotiate or mediate while favoring non-Black counterparties, and coordinated efforts to deprive Movant of even de minimis refunds. Those facts go well beyond neutral skepticism and are directly relevant to likelihood of success on Movant's § 1981 retaliation and discrimination claims.

4. **Status and Authority Misdescribed.** The Order described Movant as a "stranger to the Debtor" and treated the signatory as a "former officer" of a "former corporate manager" who was disabled by a guardianship order. The record instead shows that Movant is a professional asset-recovery investigator who deliberately prioritized the Debtor's file over 30+ other multimillion-dollar matters; that Ms. Scholes remained identified as an officer in governing documents; that no competent evidence of her removal has been produced; and that the Hawaii guardianship was never registered in the relevant jurisdictions and has never been supported by medical evidence of incapacity at the time of delegation.

5. **Evolution of the Compensation Claim Misunderstood.** The Order treated Movant's claim as a static "more than $3 million" demand, ignoring that Movant began with an approximately $625,000 compensation request consistent with the Manager's contractual authority and industry practice, and that subsequent increases reflected years of additional work and litigation caused by the Trustee's refusal to recognize or pay any part of that original, reasonable claim.

6. **Nature of the Trustee's Objection and the Benefits Conferred Overlooked.** The Order characterized the Trustee's objection as a routine, non-frivolous challenge to a disputed claim. In reality, the Trustee seeks complete disallowance notwithstanding his own admissions that Movant's work produced the $1.293 million California recovery and preserved the multi-million-dollar property interest. The objection is thus not a mere

valuation dispute but an attempt to assign zero value to undisputed benefits that enabled the estate to administer its core assets.

7. **California Funds and Constructive-Trust Theory Misapprehended.** The Order read Movant's California-funds theory as asserting that the Debtor has "no interest" in those funds and that recognizing Movant's rights would "defy logic." Movant's actual position is that the Debtor holds legal title subject to prepetition contractual duties in the LLC Agreement and Administrative Services Agreement to pay the Manager's compensation and reimbursable expenses, and that equity imposes a constructive trust to prevent unjust enrichment where the estate retains the fruits of Movant's work while refusing to honor those duties.

8. **Irreparable Harm, Balance of Harms, and Public Interest Misapplied.** The Order equated Movant's ability to file "a very large number of motions" with the absence of irreparable harm and unconstrained participation, without addressing the record of acute, time-sensitive hardship: a negative bank balance; inability to fund basic participation costs; and imminent, non-repeatable international travel commitments scheduled for December 16, 2025. It also treated the $5,000 request as a threat to estate administration and the public interest, without acknowledging that it is a de minimis, fully documented, prepetition expense embedded in Claim 4.1, to be credited against whatever allowance is ultimately granted.

These misapprehensions go to the core of the Court's conclusions on likelihood of success, irreparable harm, balance of harms, and the characterization of the relief as impermissible "final" or "extraordinary" relief. Correcting them falls squarely within the narrow scope of Rule 59(e) and Rule 60(b)(6), and is necessary to prevent manifest injustice.

## IV. CORRECT APPLICATION OF RULE 59(e) / 60(b)(6) AND THE GOVERNING STANDARDS

### A. Reconsideration Standard

Reconsideration under Fed. R. Civ. P. 59(e), made applicable by Fed. R. Bankr. P. 9023, is warranted where the Court has misapprehended a material fact, overlooked controlling law, or where reconsideration is necessary to prevent manifest injustice. See Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 7 n.2 (1st Cir. 2005).

Rule 60(b)(6), made applicable by Fed. R. Bankr. P. 9024, provides a safety valve for relief in extraordinary circumstances where prospective application of an order would be inequitable. See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863–64 (1988).

Movant is not attempting to relitigate matters already decided. Instead, he seeks correction of specific misapprehensions concerning (i) the limited nature of the relief actually requested, (ii) the undisputed evidentiary record concerning the $5,000 Sherin & Lodgen retainer, and (iii) the proper legal framework governing partial allowance of an uncontested component of a claim. Correcting these misapprehensions materially alters the analysis.

The only issue presented on reconsideration is a narrow, claims-based question: whether the Court, applying § 502(a) and the principles of partial claim allowance, may authorize immediate payment of the undisputed $5,000 component of Claim No. 4.1 for documented prepetition legal work necessary to preserve the Debtor's asset. This question is governed by the claims-allowance and distribution provisions of the Bankruptcy Code, not by Rule 65.

**B. Clarification of Narrowed Relief and Relationship to the Rule 65 Framework**

For purposes of reconsideration, Movant clarifies that the relief now sought is limited to a single, discrete item: an immediate $5,000 payment representing the severable Sherin & Lodgen retainer component of Claim No. 4.1, to be credited against whatever amount is ultimately allowed on that claim. Movant does not ask the Court to revisit its prior denial of preliminary injunctive or declaratory relief. Those rulings remain undisturbed and are preserved for later stages of this case.

This clarification is material because the Order evaluated the Emergency Motion under Fed. R. Civ. P. 65 and the traditional four-factor test for preliminary injunctive relief. While the Court correctly stated the governing legal standard, its application did not separately consider the narrow $5,000 request supported by uncontested documentation. Instead, the Order evaluated likelihood of success, irreparable harm, and the balance of hardships as if Movant were seeking immediate adjudication of his civil-rights theories, constructive-trust theories, and the entire $3.1 million compensation claim.

Under the First Circuit framework, the Court considers:

1. likelihood of success on the merits;
2. irreparable harm absent relief;
3. the balance of harms; and
4. the public interest.
   See *Sunshine Dev., Inc. v. FDIC*, 33 F.3d 106, 110–11 (1st Cir. 1994); *In re Bottcher*, 2010 Bankr. LEXIS 4697, at *3 (Bankr. D. Mass. 2010). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). Irreparable harm exists where the injury is imminent and cannot later be remedied monetarily. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).

Because the Order treated all requested relief as rising or falling together, it did not separately analyze the specific facts relevant to the $5,000 Sherin & Lodgen component—namely, that Movant personally advanced this retainer in December 2022; that the expenditure directly preserved the Debtor's interest in 231 Turnpike Road; and that this $5,000 is a documented, severable portion of Claim No. 4.1 that the Trustee has not contested.

Likewise, the Order's conclusion that no irreparable harm exists focused on Movant's ability to continue filing electronically, without addressing the actual harms identified: the imminent, non-repeatable loss of the December 16, 2025 international trip planned for years; the inability to reimburse a third party who advanced airfare on Movant's behalf; and the inability to meet contractual lodging and travel obligations without access to the $5,000. These harms cannot be repaired by a later distribution.

On reconsideration, Movant does not ask the Court to redo its prior injunction analysis. Rather, he seeks correction of factual misapprehensions that arose when the narrow $5,000 request was conflated with broader injunctive relief. That discrete request is properly evaluated under the Bankruptcy Code's claims-allowance and distribution provisions; but even if the Court elects to apply Rule 65, a correct framing of the record materially changes the analysis with respect to likelihood of success, irreparable harm, and the balance of hardships for this severable component of Claim No. 4.1.

**C. Irreparable Harm**

Correctly understood, the harm at issue is not the abstract ability to send emails to the Clerk; it is:

- the imminent, non-repeatable loss of a long-planned December 16, 2025 international trip to visit Movant's mother and attend a convention as an appointed delegate;
- the inability to reimburse a third party who already purchased Movant's ticket and to satisfy contractual group-lodging obligations; and
- the practical risk that, without even minimal funds, Movant will be effectively forced out of meaningful participation in an active bankruptcy and adversary proceeding where his rights are being adjudicated.

Those harms are **time-specific** and **non-compensable after the fact**. No later distribution or damages award can restore a missed trip, repair the reputational and relational consequences of defaulting on obligations to others, or re-create the opportunity to participate fully in litigation that has already moved past critical stages.

The Court's prior focus on the number of motions filed did not address these realities. Once the correct harms are recognized, the irreparable-harm element is satisfied.

## D. Balance of Harms

On a correctly framed record, the balance of harms weighs heavily in favor of granting the narrow relief requested:

- **Movant's side of the scale:** Without $5,000 now, Movant faces the permanent loss of a once-scheduled international trip, serious strain on third parties who relied on his participation, and ongoing inability to fund even basic participation costs in this litigation.
- **Estate's side of the scale:** The requested $5,000 is de minimis compared to the $1.293 million in California funds and the $5.1 million property value preserved, is to be credited against whatever amount is ultimately allowed on Claim 4.1, and does not restrict the Trustee's litigation strategy, administration of the estate, or ability to oppose the remainder of Movant's claim.

When a small, fully documented component of a claim is allowed on an interim basis to prevent acute hardship, and that amount can be netted against any final allowance, the risk of prejudice to other creditors is negligible. By contrast, the prejudice to Movant from continued nonpayment is severe and immediate.

## E. Public Interest

The public interest in bankruptcy is served by:

- honoring contractual and equitable obligations to those who create value for the estate;
- avoiding unjust enrichment where the estate retains 100% of the benefit of a creditor's work while paying 0% of the documented cost; and
- ensuring that a pro se creditor who preserved the estate's core assets is not effectively excluded from the process through economic strangulation.

Granting a one-time $5,000 partial distribution on a fully documented, severable component of a timely filed claim promotes confidence that the system will not exploit the contributions of those who rescue abandoned assets while denying them even minimal reimbursement. It does not

interfere with the Trustee's statutory duties, does not force a global settlement, and does not alter pending summary-judgment adjudication.

## F. Result on Reconsideration

Once the misapprehensions identified in Sections A–O are corrected, and the narrowed relief is evaluated under the proper framework, the factors underlying the Order's denial change materially:

- Movant has shown a strong merits case for at least this limited $5,000 component;
- the record establishes irreparable, time-sensitive harm that cannot be remedied later;
- the balance of harms favors granting modest, targeted relief; and
- the public interest is advanced, not harmed, by recognizing and reimbursing a core, asset-preserving expenditure.

For these reasons, Movant respectfully submits that reconsideration is warranted under Rule 59(e) and Rule 60(b)(6), and that the Court should modify the Order to grant the requested **$5,000 partial distribution on the Sherin & Lodgen retainer component of Claim 4.1**, to be credited against whatever final allowance the Court ultimately determines.

## V. Request for Partial Allowance of the Undisputed $5,000 Sherin & Lodgen Component of Claim No. 4.1

In the alternative, and independent of the reconsideration grounds set forth above, Movant respectfully requests that the Court clarify and resolve a narrow issue that does not require further factual development: whether the $5,000 Sherin & Lodgen retainer—already incorporated into Claim No. 4.1 and supported by contemporaneous documentation—may be **partially allowed** pursuant to 11 U.S.C. § 502(a) as an **undisputed, severable component** of Movant's claim.

The Trustee's objection challenges the characterization and magnitude of Movant's overall $3.1 million claim, but **nowhere disputes the existence, legitimacy, or prepetition purpose of the $5,000 retainer** advanced on December 14–15, 2022 for Sherin & Lodgen's preparation of the Motion to Vacate. The documentation required by Fed. R. Bankr. P. 3001(c) is already on the docket, and the Trustee has raised **no factual contest** regarding this discrete component of Claim No. 4.1. Under § 502(a), to the extent a portion of a filed claim is not disputed, that portion is **deemed allowed as a matter of law**.

Movant respectfully submits that the Court's prior Order appears to have treated the $5,000 request as an "interim distribution" that presupposes an unresolved claim objection. That mischaracterization materially affected the outcome. Movant is not seeking a premature distribution on a disputed claim. Movant seeks:

1. a determination that the **$5,000 component is undisputed**,
2. **partial allowance** of that severable amount, and
3. distribution on that **allowed** portion.

Once allowed, distribution is no longer "interim"; it is payment on an allowed claim in accordance with § 726.

## A. Authority to Resolve This Issue Within the Motion for Reconsideration

Because the allowance of this $5,000 component turns solely on undisputed documentary evidence and presents no factual dispute requiring discovery or testimony, Movant respectfully requests that the Court **exercise its discretion to rule on this issue within this Motion for Reconsideration**, rather than require a separate motion. Resolving this narrow and uncontested issue now will avoid unnecessary procedural delay and promote efficient administration of the estate, particularly given the emergency circumstances detailed in the supporting affidavit.

### B. In the Alternative, Request for Guidance on Whether a Separate Motion Is Required

If, however, the Court concludes that the partial allowance of this undisputed portion of Claim No. 4.1 must be raised in a separately docketed motion, Movant respectfully requests that the Court expressly so state, so that Movant may immediately file such a motion without risking inadvertent procedural error. Movant further requests that, given the imminent and time-specific nature of the December 16, 2025 international trip and the associated obligations already undertaken on Movant's behalf, any such motion be considered on an expedited basis or without further hearing if the Court determines that the existing record is sufficient.

### VI. ACKNOWLEDGMENT OF THE COURT'S ASSISTANCE, PROCEDURAL CLARIFICATION, AND SUBMISSION OF LIMITED SUPPORTING EVIDENCE

Movant respectfully acknowledges and thanks the Court for its prompt attention to the prior emergency filings and for addressing the Emergency Motion on an expedited, paper-only basis given the time-sensitive circumstances. Movant understands the substantial demands placed on the Court and appreciates the Court's willingness to review and decide the matter without the delay of full briefing or a hearing.

Movant further recognizes that, under Rule 59(e), a motion for reconsideration is typically not an opportunity to present new arguments or evidence that could have been raised earlier. Movant has therefore endeavored to avoid submitting any material not already contained in the Emergency Motion, the Supplement, or the supporting affidavit. However, because (i) the Emergency Motion was presented under extreme time constraints; (ii) no hearing was scheduled; (iii) no other party responded; and (iv) the Court expressly issued its decision without responses from other parties due to the emergency nature of the relief sought, Movant respectfully requests that, to the extent the Court finds it useful, the Court exercise its discretion to consider the limited supporting materials submitted with this reconsideration motion.

These materials do not expand the scope of the relief requested or raise new legal theories. Instead, they simply **corroborate the irreparable-harm facts that the prior Order found insufficient**, including the time-specific and non-recoverable nature of the December 16, 2025 international trip, the third-party financial commitments already undertaken on Movant's behalf, and the practical impossibility of replacing a check-based distribution in time to avoid permanent harm.

Specifically, Movant includes the following **supporting exhibits**:

1. **Exhibit 1:** Plane ticket and itinerary showing confirmed departure on **December 16, 2025**, demonstrating that the opportunity is fixed and non-repeatable.
2. **Exhibit 2:** Copy of the **Togo visa** confirming non-refundable travel preparations.
3. **Exhibit 3:** Copy of Movant's **renewed U.S. passport**, which was only obtained because the Court previously authorized release of the IRS refund check; absent that prior relief, Movant would not have had the funds necessary to renew his passport.

4. **Exhibit 4: Hotel reservation confirmation**, showing contractual lodging commitments and financial obligations tied to Movant's attendance.
5. **Exhibit 5: Nature of the pre-planned group trip**, the December 2025 trip to Lomé, Togo is a pre-assigned, highly coordinated program planned years in advance, with fixed lodging, scheduled activities, and detailed group logistics. Participation requires adherence to assigned dates, locations, and events. The trip cannot be postponed, rescheduled, or substituted. Missing the departure destroys the entire opportunity, and all associated arrangements become unusable.

Movant respectfully submits that these materials merely clarify and substantiate facts that were already before the Court in narrative form, and are offered to assist the Court in understanding the immediacy and irreversibility of the harm.

Movant also respectfully states that he does **not** request a hearing on this reconsideration motion and would be grateful if the Court were willing to rule on the papers, as time remains extremely limited. Should the Court authorize the $5,000 partial distribution, Movant further requests—if feasible—that the Trustee be permitted to transmit the funds by **wire transfer**, as mail-based delivery and bank processing times would likely render the relief ineffective given the imminent departure date.

Movant provides this additional information solely to assist the Court in understanding the full factual context, not to expand the scope of the legal issues or disturb the Court's prior rulings on injunctive or declaratory relief.

## VII. RELIEF REQUESTED AND CONCLUSION

For the reasons set forth above and in Movant's prior submissions, once the record is correctly understood and the narrowed relief is evaluated under the proper standards of Rule 59(e) and Rule 60(b)(6), the result should be different. Movant is not asking the Court to revisit its denial of preliminary injunctive or declaratory relief, to alter the summary-judgment schedule, or to restrict the Trustee's administration of the estate. The only relief sought on reconsideration is a limited, claims-process-based determination and payment of a single, fully documented, severable prepetition expenditure that directly preserved the estate's core real-estate asset.

**WHEREFORE**, Movant respectfully requests that the Court:

1. Grant this Motion for Reconsideration in part, to the extent necessary to correct the factual and analytical misapprehensions regarding the narrow $5,000 request embedded in Claim No. 4.1;
2. Modify the December 5, 2025 Order solely to reflect that the only relief presently at issue is the request for allowance and payment of the $5,000 Sherin & Lodgen retainer component of Claim No. 4.1, and that the Court's prior rulings on injunctive and declaratory relief remain undisturbed;
3. Authorize and direct the Chapter 7 Trustee to make an immediate $5,000 payment to Movant on account of the Sherin & Lodgen retainer component of Claim No. 4.1, such payment to be treated as:
(a) a partial allowance or distribution on that severable, undisputed portion of Claim No. 4.1; and
(b) a credit against whatever total amount the Court ultimately allows on Movant's claim, all without prejudice to any party's position concerning the remaining disputed portions of Claim No. 4.1;

4. Clarify that this limited relief arises solely from Movant's existing, timely filed proof of claim, and from the supporting affidavit and documentary evidence already in the record, and therefore does not require Movant to file a new or amended proof of claim; and

5. Invoke, to the extent necessary, the Court's inherent authority under 11 U.S.C. § 105(a) and its equitable powers to prevent manifest injustice and to ensure the fair administration of the case. Even if any procedural uncertainty exists regarding the vehicle for granting this narrow relief, the Court retains inherent power to fashion an appropriate remedy where the equities strongly favor action, the material facts are undisputed, and the requested relief is both modest and essential to avoid irreparable harm.

DATED: December 7, 2025, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276



## Passenger Information

| | |
|---|---|
| **TICKET NUMBER** | 0712150929885 |
| **PASSENGER NAME** | AKOUETE/LOLONYON YOUANA MR |
| **NAME REF** | ADT |
| **ISSUE DATE** | 22 FEB 2025 |
| **ISSUING AIRLINE** | ETHIOPIAN AIRLINES |
| **ISSUING AGENT** | ETHIOPIAN AIRLINES/DSD |
| **ISSUING AGENT LOCATION** | DES MOINES, IA |

## Booking Reference

EQWBXG

## Itinerary Details

| FLIGHT | DEPART | ARRIVE | CABIN/SEAT | BAGGAGE | FLIGHT INFO |
|---|---|---|---|---|---|
| **ET 515** Ok to fly | **NEW YORK JFK, NY (JFK)** TERMINAL 7 **16/Dec/2025** 9:00pm | **LOME, TOGO (LFW)** **17/Dec/2025** 12:05pm | **Economy / V 15A** | **2 pieces** | **Fare Basis:** VHXESUS/WEB **Not Valid Before:** 16 Dec **Not Valid After:** 16 Dec |
| |  This is not a boarding pass | | | | |
| **ET 514** Ok to fly | **LOME, TOGO (LFW)** **30/Dec/2025** 1:00pm | **NEW YORK JFK, NY (JFK)** TERMINAL 7 **30/Dec/2025** 7:00pm | **Economy / V 15A** | **2 pieces** | **Fare Basis:** VHXESUS/WEB **Not Valid Before:** 30 Dec **Not Valid After:** 30 Dec |
| |  This is not a boarding pass | | | | |

**Receipt And Payment Details**

| | |
|---|---|
| **Fare** | USD 788.00 |
| **Taxes/Fees/Carrier-Imposed Charges** | USD 8.62 YQI (Service Fee - Carrier-Imposed MISC) |
| | USD 484.00 YRF (Service Fee - Carrier-Imposed Fuel) |
| | USD 8.00 YRI (Service Fee - Carrier-Imposed MISC) |
| | USD 45.80 US2 (US International Transportation Tax) |
| | USD 7.20 YC (US Customs User Fee) |
| | USD 7.00 XY2 (XY2) |
| | USD 3.71 XA (US Aphis User Fee) |
| | USD 5.60 AY (US Security Fee) |
| | USD 15.90 VO (Passenger Service Charge) |
| | USD 4.80 YG (Security Tax) |
| | USD 4.80 YH (Embarkation Tax) |
| | USD 15.90 ZT (Aeronautical Development Charge) |
| | USD 20.70 SM (Infrastructure Development Charge - RDIA) |
| | USD 2.40 J8 (J8) |
| | USD 2.40 J82 (J82) |
| | USD 4.50 XF (US Passenger Facility Charge) |
| **Fare Calculation Line** | NYC ET LFW394.00ET NYC394.00NUC788.00END ROE1.00 XFJFK4.5 |
| **Form of Payment** | Credit Card - Visa : XXXXXXXXXXXX 9458 |
| **Total** | **USD 1429.33** |

**Allowances**

**Baggage Allowance**

JFK TO LFW - 2 PIECES

ETHIOPIAN AIRLINES, EACH PIECE UP TO 50 POUNDS/23 KILOGRAMS

LFW TO JFK - 2 PIECES

ETHIOPIAN AIRLINES, EACH PIECE UP TO 50 POUNDS/23 KILOGRAMS

ADDITIONAL ALLOWANCES AND/OR DISCOUNTS MAY APPLY DEPENDING ON FLYER-SPECIFIC FACTORS /E.G.

FREQUENT FLYER STATUS/MILITARY/ CREDIT CARDFORM OF PAYMENT/EARLY PURCHASE OVER INTERNET,ETC

**Carry On Allowances**

JFK TO LFW , LFW TO JFK - 1 PIECE (ET - ETHIOPIAN AIRLINES) UP TO 15 POUNDS/7 KILOGRAMS AND UP TO 45 LINEAR INCHES/115 LINEAR CENTIMETERS

**Carry On Charges**

JFK TO LFW , LFW TO JFK - (ET - ETHIOPIAN AIRLINES) - CARRY-ON FEES UNKNOWN - CONTACT CARRIER

**Positive identification required for airport check in**

**Notice:**

Online check-in is available 48 hours before departure. Save your time and avoid last minute rush. You can do check in with the below mentioned options:-

- Ethiopian Airlines Mobile APP
- Ethiopian Website  https://www.ethiopianairlines.com
- Ethiopian Chat Bot @Ethiopian_chat_bot

If the passenger's journey involves an ultimate destination or stop in a country other than the country of departure the Warsaw Convention (or any amendments thereof) or the Montreal Convention may be applicable and these Conventions govern and in most cases limit the liability of carriers for death or personal injury and in respect of loss or damage to baggage. Further information may be obtained from the carrier.

**Additional service purchase document notice:**

- Payments made for additional services are non-refundable unless for involuntary changes attributed by the Airline.

We want to hear from you if you have any  Complaint or other- travel feedback regarding our service/product; please write us on the feedback page.



**Data Protection Notice:** Your personal data will be processed in accordance with the applicable carrier's privacy policy and, if your booking is made via a reservation system provider ("GDS"), with its privacy policy. These are available at http://www.iatatravelcenter.com/privacy or from the carrier or GDS directly. You should read this documentation, which applies to your booking and specifies, for example, how your personal data is collected, stored, used, disclosed and transferred.

Important Legal Notices



**RÉPUBLIQUE TOGOLAISE**

# BORDEREAU DE VOYAGE

*Prière de conserver ce reçu. Il sera requis aux contrôles d'immigration et sanitaires aux postes-frontières*

**FORMALITE D'ENTREE**

### CONTROLE FRONTALIER



*Référence d'enregistrement*

## -- C38PK88MQ - -

*Nom / Last name :* **Akouete**
*Prénom / First name :* **Lolonyon**
*Sexe / Gender :* **M**
*Document* **PP : A80681590**
*Numéro de téléphone / Phone number :* **+14434473276**

*Compagnie aérienne :* **ETH - ETHIOPIAN AIRLINES**
*Vol n° :* **ET515** - *Du :* **2025-12-17**
*Venant de :* **John F Kennedy International Airport (US)** -*Allant à :* **Lomé–Tokoin International Airport (TG)**

**EXEMPTÉ**

### E-VISA

*N° d'enregistrement :* **C38PK88MQ**
*Document PP:* **A80681590** - *Nationalité :*
*Motif :* **M-CONF-SE**
*Entrée :* **Multiple**

*N° du visa :* **76614-2025**
*Type de visa :* **V-PROF**
*Durée :* **15 jours.** *Valide du* **2025-12-17** *au* **2025-12-31**

*Ref Paiement :* **642JUY472JLL**



*Ce document est signé numériquement. Vous pouvez l'authentifier en scannant ce QR code sur :*
*This document is digitally signed. You can authenticate it by scanning this QR code at :*

*https://e-certs.gouv.tg/verify*



**HOTEL ECOLE**
**LEBENƐ**

## CONFIRMATION RESERVATION

GUEST NAME :    LOLONYON YOUANA AKOUETE

DATE ARRIVAL: 17-DEC-25

DEPARTURE DATE: 30-DEC-25

ROOM TYPE: STANDARD

NUMBER OF NIGHTS: 13

NUMBER OF ROOMS: 1

NUMBER OF PERSONS: 1

HOTEL ECOLE LEBENE
Avenue du Général de Gaulle
BP-128 Lome Rép. du TOGO
Tel: +228 22 21 24 85 / 93 23 49 34
IB BANK N° 024568300101-44

*Avenue du Général de Gaulle 01 B.P. 128 Lomé – TOGO,Tél : +228 22 21 2485/+228 93 23 49 34 /*
*+ 228 93 23 49 77,Email : info@lebenehotel.com / contact@lebenehotel.com, www.lebenehotel.com*
*NIF : 1001243758*



**Lolonyon Akouete <loloact2@gmail.com>**

---

## Clarification on Room Occupancy & Booking Inquiry – Ecole LéBénè (Dec 17-30, 2025)

---

**LEBENE Hotel** <info@lebenehotel.com>                               Sun, Feb 23, 2025 at 11:53 AM
To: Lolonyon Akouete <loloact2@gmail.com>

Hello,
We acknowledge receipt of your email and thank you,
We confirm a twin room except that the third person would have to pay 15000 fcfa per night for an additional mattress,
Which will cost you 107500 fcfa per night,

Attached are the confirmations,
[Quoted text hidden]

---

📄 **AKOUETE.docx**
18K

# <u>CONFIRMATION RESERVATION</u>

**Guest Name:**      **MANOLIS DANIEL ALEXIOU**

                     **WILLIAM GARRETT VALK**

                      **LOLONYON YOUANA AKOUETE**

Date Arrival: 17-DEC-25

Departure Date: 30-DEC-25

Room Type: Ville Renovée

Number of Nights: 13

Number of Rooms: 1

Number of persons:3

Price of rooms :96 500 FCFA Or 107 500 FCFA







PASSPORT / PASSEPORT / PASAPORTE

USA

UNITED STATES OF AMERICA

Type / Type / Tipo: P
Code / Code / Código: USA
Passport No. / No. du Passeport / No. de Pasaporte: 511106806

Surname / Nom / Apellidos: AKOUETE
Given Names / Prénoms / Nombres: LOLONYON YOUANA
Nationality / Nationalité / Nacionalidad: UNITED STATES OF AMERICA
Date of birth / Date de naissance / Fecha de nacimiento: 08 Oct 1986
Place of birth / Lieu de naissance / Lugar de nacimiento: TOGO
Sex / Sexe / Sexo: M
Date of issue / Date de délivrance / Fecha de expedición: 07 Oct 2013
Date of expiration / Date d'expiration / Fecha de caducidad: 06 Oct 2023
Authority / Autorité / Autoridad: United States Department of State
Endorsements / Mentions Spéciales / Anotaciones: SEE PAGE 27

P<USAAKOUETE<<LOLONYON<YOUANA<<<<<<<<<<<
5111068064USA8610083M2310060326877671<708958

PASSPORT / PASSEPORT / PASAPORTE

USA

THE UNITED STATES OF AMERICA

Type/Type/Tipo: P
Code/Code/Código: USA
Passport No./No. du Passeport/No. de Pasaporte: A80681590

Surname/Nom/Apellidos: AKOUETE
Given names/Prénoms/Nombres: LOLONYON YOUANA
Nationality/Nationalité/Nacionalidad: UNITED STATES OF AMERICA
Date of birth/Date de naissance/Fecha de nacimiento: 08 OCT 1986
Place of birth/Lieu de naissance/Lugar de nacimiento: TOGO
Sex/Sexe/Sexo: M
Date of issue/Date de délivrance/Fecha de expedición: 21 AUG 2025
Date of expiration/Date d'expiration/Fecha de caducidad: 20 AUG 2035
Authority/Autorité/Autoridad: UNITED STATES DEPARTMENT OF STATE

P<USAAKOUETE<<LOLONYON<YOUANA<<<<<<<<<<<
A806815903USA8610083M3508208963704686<208430

 **My Trip**

# Akouete, Lolonyon

G-DGM9-W2KY-QR9
United States

**Group: 7QYW-Y39B-GMPD**

| NAME | ARRIVAL | DEPARTURE |
|---|---|---|
| Akouete, Lolonyon | 17 Dec 12:05 PM | 30 Dec 1:00 PM |
| Valk, William IV | 17 Dec 12:05 PM | 30 Dec 1:00 PM |
| Alexiou, Manny | 17 Dec 12:05 PM | 30 Dec 1:00 PM |



## Accommodations

**Ecole LéBénè**
Avenue du Général de Gaulle
Lomé
View Map

info@lebenehotel.com
+228 22 21 24 85

## Convention Venue

Lomé, Préfecture du Golfe, Togo
View Map

## Hospitality Committee

SC156BJ@jwevent.org

## Activities

| DATE | ACTIVITY | PICKUP LOCATION |
|---|---|---|
| **Monday, Dec 22**<br>9:30 AM - 2:00 PM | **Field Service**<br>FS-22-LEB-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Tuesday, Dec 23**<br>7:30 AM - 3:30 PM | **Missionaries for one day Tour**<br>MOD-23-MIX-4 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Wednesday, Dec 24**<br>4:00 PM - 9:00 PM | **Evening Gathering**<br>EG-24-LEB-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Thursday, Dec 25**<br>11:30 AM - 2:30 PM | **Be our Guest!**<br>BOG-25-LEB-8 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Friday, Dec 26**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-26-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Saturday, Dec 27**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-27-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Sunday, Dec 28**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-28-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Monday, Dec 29**<br>9:00 AM - 2:30 PM | **City of Lomé Tour**<br>CL-29-MIX-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |

Case 25-04033    Doc 90    Filed 12/08/25    Entered 12/08/25 09:29:56    Desc Main
Document    Page 39 of 40

# Valk, William IV

G-VRMV-Y9M2-JQ7
United States



## Group: 7QYW-Y39B-GMPD

| NAME | ARRIVAL | DEPARTURE |
|------|---------|-----------|
| Akouete, Lolonyon | 17 Dec 12:05 PM | 30 Dec 1:00 PM |
| Valk, William IV | 17 Dec 12:05 PM | 30 Dec 1:00 PM |
| Alexiou, Manny | 17 Dec 12:05 PM | 30 Dec 1:00 PM |

## Accommodations

**Ecole LéBénè**
Avenue du Général de Gaulle
Lomé
View Map

info@lebenehotel.com
+228 22 21 24 85

## Convention Venue

Lomé, Préfecture du Golfe, Togo
View Map

## Hospitality Committee

SC156BJ@jwevent.org

## Activities

| DATE | ACTIVITY | PICKUP LOCATION |
|------|----------|-----------------|
| **Monday, Dec 22**<br>9:30 AM - 2:00 PM | **Field Service**<br>FS-22-LEB-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Tuesday, Dec 23**<br>7:30 AM - 3:30 PM | **Missionaries for one day Tour**<br>MOD-23-MIX-4 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Wednesday, Dec 24**<br>4:00 PM - 9:00 PM | **Evening Gathering**<br>EG-24-LEB-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Thursday, Dec 25**<br>11:30 AM - 2:30 PM | **Be our Guest!**<br>BOG-25-LEB-8 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Friday, Dec 26**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-26-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Saturday, Dec 27**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-27-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Sunday, Dec 28**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-28-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Monday, Dec 29**<br>9:00 AM - 2:30 PM | **City of Lomé Tour**<br>CL-29-MIX-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |

# Alexiou, Manny

G-YYEM-766B-WEW
United States



## Group: 7QYW-Y39B-GMPD

| NAME | ARRIVAL | DEPARTURE |
|------|---------|-----------|
| Akouete, Lolonyon | 17 Dec 12:05 PM | 30 Dec 1:00 PM |
| Valk, William IV | 17 Dec 12:05 PM | 30 Dec 1:00 PM |
| Alexiou, Manny | 17 Dec 12:05 PM | 30 Dec 1:00 PM |

## Accommodations

**Ecole LéBénè**
Avenue du Général de Gaulle
Lomé
View Map

info@lebenehotel.com
+228 22 21 24 85

## Convention Venue

Lomé, Préfecture du Golfe, Togo
View Map

## Hospitality Committee

SC156BJ@jwevent.org

## Activities

| DATE | ACTIVITY | PICKUP LOCATION |
|------|----------|-----------------|
| **Monday, Dec 22**<br>9:30 AM - 2:00 PM | **Field Service**<br>FS-22-LEB-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Tuesday, Dec 23**<br>7:30 AM - 3:30 PM | **Missionaries for one day Tour**<br>MOD-23-MIX-4 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Wednesday, Dec 24**<br>4:00 PM - 9:00 PM | **Evening Gathering**<br>EG-24-LEB-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Thursday, Dec 25**<br>11:30 AM - 2:30 PM | **Be our Guest!**<br>BOG-25-LEB-8 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Friday, Dec 26**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-26-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Saturday, Dec 27**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-27-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Sunday, Dec 28**<br>7:30 AM - 6:30 PM | **Convention**<br>CV-28-LEB-2 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |
| **Monday, Dec 29**<br>9:00 AM - 2:30 PM | **City of Lomé Tour**<br>CL-29-MIX-1 | **Ecole LéBénè**<br>Avenue du Général de Gaulle Lomé TGO |